In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 13-1797, 13-1807

CENTERPOINT ENERGY SERVICES, INC.,

*Plaintiff-Appellee,*

*v.*

CAMEEL HALIM, *et al.*,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 10 C 2121 — **Virginia M. Kendall**, *Judge*.

ARGUED JANUARY 23, 2014 — DECIDED FEBRUARY 18, 2014

Before POSNER and RIPPLE, *Circuit Judges*, and GILBERT,
*District Judge*.[*]

POSNER, *Circuit Judge*. This is a diversity suit charging violations of 740 ILCS §§ 160/1 *et seq*., Illinois's version of the Uniform Fraudulent Transfer Act, and of the Illinois common law of successor and alter ego liability. The plaintiff is a gas company that the parties refer to as CES. The defendants

_____

[*] Of the Southern District of Illinois, sitting by designation.

are a married couple named Halim (and the Halims' personal trusts, which need not be discussed separately, however) and a company they wholly own named WR Property Management, LLC. The district court granted summary judgment in favor of CES and entered a final judgment for $2.7 million (we round all dollar figures to the nearest hundred thousand), which includes interest and attorneys' fees along with damages.

In the fall of 2006 Wilmette Real Estate & Management Co., LLC, another company wholly owned by the Halims (in fact WR's predecessor, as we'll see), had contracted with CES to buy natural gas from it. The Halims owned, among other assets, 41 rental properties in the Chicago area. Wilmette was the manager and lessor of these properties, and was responsible for supplying gas to them. CES delivered gas to the properties pursuant to the contract, but in November 2007 Wilmette stopped paying it. Between then and March 1, 2008, when CES finally cut off service, Wilmette racked up $1.2 million in gas bills, which it refused to pay.

CES sued Wilmette in Illinois state court for breach of contract. The court granted summary judgment in favor of CES and in December 2009 entered a final judgment for $1.7 million, affirmed in *Centerpoint Energy Services, Inc. v. Wilmette Real Estate & Management Co.*, 2010 WL 9922947 (Ill. App. Sept. 14, 2010). The difference between the amount of the judgment and the $1.2 million in unpaid gas bills represented interest and attorneys' fees. The contract had required Wilmette, should it be delinquent in paying CES's invoices, to compensate CES "for all costs and expenses incurred by [CES] (including reasonable attorney fees) to collect amounts due and owing" under the contract, and to pay

interest on the unpaid balance at an uncompounded rate of 1.5 percent per month (18 percent per year).

Wilmette paid no part of the judgment. For by this time it was a shell, though it had not been dissolved. In July 2008, just three weeks after CES had filed suit, the Halims had transferred all of Wilmette's financial and other assets, along with all of its contracts and employees, to a new company, defendant WR Property Management, LLC, also wholly owned by the Halims, as we noted. Even before the transfer to WR the Halims had taken steps to prevent the judgment against Wilmette from being paid. Wilmette had billed the lessees of the properties it managed for the gas that it had bought from CES and delivered to the lessees. And the lessees had paid—$1.2 million. The Halims caused Wilmette to transfer that money to them rather than use it to honor its contractual obligation to CES.

In April 2010, some four months after the entry of judgment in the state court case, CES, unable to collect the judgment, sued the Halims and WR in federal court, alleging fraudulent conveyance of Wilmette's assets to the Halims and WR in violation of the Fraudulent Transfer Act; successor liability (of WR as successor to Wilmette); and alter ego liability—the Halims were the alter ego of Wilmette and liable therefore for its debts regardless of any fraudulent transfers. The district judge granted summary judgment for CES on the fraudulent-conveyance and successor-liability claims and having done so dismissed the alter ego charge as moot. She entered a final judgment against the Halims and WR for $2.7 million—the amount of the unpaid state-court judgment against Wilmette, plus post-judgment interest from the date

of that judgment at an annual rate of 9 percent and attorneys' fees incurred by CES in the district court proceeding.

The Fraudulent Transfer Act punishes two types of fraud on a creditor. The first ("actual fraud") is a transfer of assets "with actual intent to hinder, delay, or defraud any creditor." 740 ILCS 160/5(a)(1). The second ("constructive fraud") is a transfer of assets "without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor … intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due." 740 ILCS 160/5(a)(2)(B). The subjective element ("actual intent") makes the first type of fraudulent conveyance more difficult to prove, and while CES alleged both types, it based its motion for summary judgment (which the district judge granted) on the second. It argued successfully that the Halims had caused Wilmette to transfer all its assets to them and WR, leaving Wilmette—which received nothing in return—unable to pay its debt to CES.

The defendants argue that the assets transferred by Wilmette belonged not to it but to the Halims personally, their personal assets being commingled in Wilmette's bank accounts with Wilmette's own assets. But what the evidence showed was different—that the Halims managed Wilmette's finances in such a way that the company would have a "zero balance" so that creditors could not collect a judgment against it. If it incurred a debt that the Halims wanted paid, for example a debt to a contractor who did work on one of their properties, the Halims would deposit money in Wilmette's bank account to enable Wilmette to pay the debt. If there was money left over after the debt was paid, or when

Wilmette received rental or other money, the Halims would cause Wilmette to transfer the money to them for deposit in their personal bank accounts, leaving Wilmette with a zero balance.

Between 2005 and 2008 Wilmette transferred $10.9 million to the Halims. They say that rather than being intended to evade the judgment the transfer was repayment of loans that the Halims had made to Wilmette. But there are no loan documents. They say they deposited $26 million in Wilmette's account during this period, but there is no documentation of that either. The absence of documentation supports CES's claim of alter ego liability; Wilmette was the Halims' piggy bank. If, moreover, they provided Wilmette with a net capital infusion of $15.1 million ($26 million – $10.9 million), what happened to that money? Wilmette reported a net loss during the three-year period of the supposed transfers to and from the Halims. They do not explain where the $15.1 million went.

And lest CES find *anything* in Wilmette's bank accounts or other assets to levy on in satisfaction of a judgment in the breach of contract suit, remember that shortly after that suit was filed the Halims had emptied all of Wilmette's remaining assets (having already transferred to their personal bank accounts the $1.2 million that Wilmette had obtained from the resale of CES's gas to its lessees) into their newly created, wholly owned company WR.

So CES proved constructive fraud. It also proved successor liability. Under Illinois law, the purchase even of a company's entire assets ordinarily does not cause the purchaser to assume the company's liabilities. But there are exceptions, of which the most common and obvious is if the purchaser

expressly assumes those liabilities. *Vernon v. Schuster*, 688 N.E.2d 1172, 1175–76 (Ill. 1997); *Diguilio v. Goss International Corp.*, 906 N.E.2d 1268, 1275–76 (Ill. App. 2009). Wilmette did that, assigning to WR "all its rights *and obligations* as managing agent for the properties" (emphasis added)—obligations that included Wilmette's debt to CES. The defendants have conceded as they must that WR is Wilmette's successor. So WR is liable for Wilmette's debt but so are the Halims for having caused Wilmette to transfer to them the $1.2 million that Wilmette owed CES, an action that in combination with the transfer of Wilmette's remaining assets to WR—also engineered by the Halims—rendered Wilmette unable to pay any part of the gas bill, let alone the state-court judgment.

There is no more need for us than there was for the district judge to address CES's third claim for relief—that the Halims are the alter ego of Wilmette and WR. But we don't want to leave the impression that it is a negligible claim; it is a strong claim. The Halims commingled Wilmette's assets with their personal assets, failing as we saw earlier to comply with the formalities that would have provided documentary evidence of an allocation of assets between them and Wilmette. And now they are doing the same with WR's assets. They began in April 2011 to drain WR's assets into yet another company of their creation, CH Ventures, LLC, and the process is, it appears, now complete, leaving WR the same kind of empty shell as Wilmette. (The "Contact Us" page on CH Venture's website lists the company's name as "WR Property Management, LLC." www.chven turesllc.com/contact.php (visited Feb. 18, 2014).) So entwined are the Halims and WR that it was a violation of Fed. R. App. P. 32(a)(7)(B) for the Halims, and WR, to file separate

opening and reply briefs, the combined length of which violates the word limits in that rule.

If the Halims are wise, they will start heeding the adage: if you're in a hole, stop digging.

We need to discuss two more issues. 735 ILCS 5/2-1303 provides that "judgments recovered in any court shall draw interest at the rate of 9% per annum from the date of the judgment until satisfied." The district court ruled that CES was entitled to such interest beginning on the date of the state court judgment. Relying on language in the gas contract, CES had asked for interest at the rate of 18 percent rather than 9 percent, but the district court ruled that under Illinois law the terms of a contract sued upon "merge" into the final judgment in a suit on the contract, thus limiting a prevailing plaintiff to the relief granted in the judgment. *Doerr v. Schmitt*, 31 N.E.2d 971, 972 (Ill. 1941); *Bank of Pawnee v. Joslin*, 521 N.E.2d 1177, 1186–87 (Ill. App. 1988); *U.S. Mortgage Co. v. Sperry*, 138 U.S. 313, 352 (1891) (Illinois law). To allow a fresh suit would be in effect to allow the reopening of a suit that had been closed by the entry of a final judgment. The state court judgment for CES had made no provision for interest, so CES's claim to 18 percent interest rested entirely on the language of the contract, and the contract suit could not be reopened to correct that omission from the judgment.

But as a consolation prize the district court awarded CES *statutory* post-judgment interest dating from the entry of the final judgment in the state court case. In effect the district court said to CES: "I can't give you 18 percent, but you're entitled by Illinois law to 9 percent, so I'll give you that."

The defendants challenge this ruling on the ground that CES hadn't proposed 9 percent as an alternative rate of interest to which it might be entitled. Actually CES *had* proposed the 9-percent alternative, in its petition for fees and interest. And in any event both the imposition of post-judgment interest and the 9 percent rate are required by the Illinois statute. 735 ILCS 5/2-1303; *Niemeyer v. Wendy's International, Inc.*, 782 N.E.2d 774, 777 (Ill. App. 2002); *Houben v. Telular Corp.*, 309 F.3d 1028, 1039 (7th Cir. 2002) (Illinois law). No proposal, no contractual provision, is required.

Last is the question of attorneys' fees incurred by CES in the current litigation. The contract language quoted at the beginning of this opinion, which makes Wilmette (and derivatively the Halims and WR) liable "for all costs and expenses incurred by [CES] (including reasonable attorney fees) to collect amounts due and owing," is broad enough to embrace the expenses incurred by CES in this suit—a suit to collect amounts owed CES by virtue of Wilmette's breach. But the defendants argue that the right conferred by the contractual language is extinguished by the merger rule already mentioned, and that therefore CES should have asked the state court to include in its judgment an order that the defendants pay attorneys' fees incurred in any subsequent suit by CES to enforce the judgment, such as the present suit.

Not so. Illinois law does not merge a contractual right to attorneys' fees into a judgment when the fees are "ancillary to the primary cause of action," *Stein v. Spainhour*, 553 N.E.2d 73, 76 (Ill. App. 1990); see also *Lowrance v. Hacker*, 966 F.2d 1153, 1157–58 (7th Cir. 1992) (Illinois law), and the attorneys' fees incurred by CES to enforce the state court judgment in a separate proceeding in a different court sys-

tem were ancillary to the fees incurred in the primary proceeding, which was the state court case that established the defendants' breach of the gas contract.

Merger would encourage the kind of contumacy displayed by the Halims in this case, because by voiding the attorneys' fees provision in the gas contract it would reduce the cost to them of unlawfully resisting efforts to collect a judgment awarded against them and upheld on appeal. And the prospect of merger would give the creditor an incentive to ask the court in his collection suit (CES's state court suit) either to leave the judgment open to allow an additional award of fees should the creditor have to bring a separate suit to enforce the judgment, or to award the creditor some rough estimate of what the future collection costs would be likely to be. Neither is a satisfactory solution to problems created by a merger rule. *Moorhead v. Dodd*, 265 S.W.3d 201, 204–05 (Ky. 2008).

The defendants make a number of other arguments, but they are makeweights, repetitive, or frivolous, and do not merit discussion, with one minor exception. The defendants are correct that the postjudgment interest rate applicable to the judgment entered by the district court (as distinct from the earlier state-court judgment) is 0.14 percent per annum, not the 0.15 percent that the district court awarded. 28 U.S.C. § 1961(a). This works out to a difference of about $270 a year—on a judgment of $2.7 million. Nevertheless the defendants are entitled to the correction, and we direct the district judge to make it.

With that minor modification, the judgment of the district court is AFFIRMED.