2016 IL App (1st) 132023
Nos. 1-13-2023, 1-13-2024 & 1-14-0083 (cons.)
Opinion Filed March 2, 2016

THIRD DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

|  |  |  |
|---|---|---|
| STEINER ELECTRIC COMPANY, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | Appeal from the |
| | ) | Circuit Court |
| v. | ) | of Cook County, |
| | ) | Illinois. |
| LEONARD J. MANISCALCO and | ) | |
| SACKETT SYSTEMS, INC., | ) | No. 2010 L 012239 |
| | ) | |
| Defendants-Appellants. | ) | The Honorable |
| | ) | Clare E. McWilliams, |
| | ) | Judge Presiding. |

_____

JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.
Presiding Justice Mason and Justice Pucinski concurred in the judgment and opinion.

**OPINION**

¶ 1        Plaintiff Steiner Electric Company (Steiner), an Illinois corporation that extended credit to defendant Leonard J. Maniscalco's Delta Equipment Company (Delta) and Sackett Systems, Inc. (Sackett), and was not properly compensated thereafter, obtained a default judgment against Delta. By that time, however, Delta had been dissolved. Steiner then filed suit to pierce the corporate veil, such that Maniscalco, as well as his corporate entity, Sackett, would be held liable for Delta's debt. Following a bench trial, the circuit court pierced the

corporate veil and entered judgment in favor of Steiner and against Maniscalco and Sackett, jointly and severally. On appeal, Maniscalco and Sackett contend that the circuit court erred by: (1) holding Maniscalco liable for Delta's debt to Steiner where there is no unity of ownership between Maniscalco and Delta; and (2) holding Sackett liable for Delta's debt to Steiner where there is no unity of ownership between it and Delta. Maniscalco and Sackett also contend that there would be no injustice in preserving the corporate entities here. In a separate but consolidated appeal, Steiner contends, in an issue of first impression, that the circuit court erred in refusing to award attorney fees for fees expended in the suit to pierce the corporate veil where the attorney fees provision was contractual in the underlying, ancillary suit. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3        Because the relationships between the parties herein are complex, we briefly discuss them here. Steiner sold electrical products to Maniscalco's companies, Delta and Sackett, on credit. Steiner was not fully paid for the products. Eventually, Steiner brought suit against Delta to enforce the credit contract. In 2009, Steiner won a default judgment against Delta for $226,686, representing the cost of the products, as well as finance charges, attorney fees, expenses, and costs. By that time, however, Delta no longer existed. Steiner then attempted to collect the judgment against Delta by filing the instant action against Maniscalco and Sackett in 2010, asking the circuit court to pierce the corporate veil, alleging that Maniscalco's various improprieties, both individually and through the use of his corporate entity, Sackett, rendered both Maniscalco and Sackett liable for the Delta judgment. After a multi-day trial in which the court heard testimony and entered over 150 exhibits into

evidence, the court determined that piercing the corporate veil was the appropriate remedy, and held both Maniscalco and Sackett liable for the Delta judgment.

¶ 4      At trial, Maniscalco testified about the nature of his businesses, the history of his corporations, his relationship with Steiner, his position as shareholder, his family trust agreement, and his business dealings with Steiner. Maniscalco, individually and through his revocable trust, was Delta and Sackett's sole shareholder. He also owned both of the buildings in which Delta and Sackett operated.

¶ 5      Maniscalco owns or has owned three businesses relevant to this case: Delta, Sackett, and Delta Power.

¶ 6      Delta was incorporated in 1972, and was in the business of selling and servicing batteries. When he incorporated Delta, Maniscalco did not contribute any unencumbered capital, but rather loaned $10,000 to Delta upon incorporation. He periodically loaned it additional money thereafter. Around the year 2000, Delta's business changed to selling, installing, and maintaining natural gas powered electric generators sold to Delta by Steiner. The Delta business operated out of a building it leased from Maniscalco.

¶ 7      Initially, Maniscalco was the only corporate officer at Delta. Maniscalco's wife was secretary of Delta until her death in 1986. At that time, Maniscalco appointed his three daughters as secretary, treasurer, and assistant treasurer. They were 22, 20, and 17 years old, respectively, at the time. The daughters had no duties in the company other than to attend one annual meeting. At trial, Maniscalco admitted that the Delta corporate bylaws require the corporation to have a vice president, but that he neither elected nor appointed a vice president.

¶ 8        Maniscalco's son-in-law, Paul Adank, was employed as the general manager of Delta. As general manager, Adank reported directly to Maniscalco from 2000 to 2009, when the company was dissolved. Maniscalco testified that he had the "last word" on both Delta and Sackett business. Maniscalco made the decision in December 2008 or January 2009 to close Delta.

¶ 9        In 1998, Maniscalco created Delta Power Systems, Inc. (Delta Power), which was a division of Delta. Maniscalco explained at trial that Delta Power was created for his employees, but that the venture was not successful. Delta Power handled Delta's stationary battery charger business. He separated it from Delta in 2003 and eventually sold it to another company, Alpine Power, in 2005.

¶ 10       Sackett was incorporated in 1982. It was and continues to be in the business of manufacturing and selling battery storage systems. It purchased supplies from Steiner. It also operates out of a building leased from Maniscalco that is adjacent to the former Delta premises. Another son-in-law of Maniscalco, Dan Dwyer, is the general manager of Sackett. He reports directly to Maniscalco. Maniscalco testified that the relationship between Sackett and Steiner was "mutually beneficial" and continued from 1989 to late 2008 or January 2009.

¶ 11       Steiner is an Illinois company that distributes electrical products and services, including generators. Steiner began selling electrical supplies to Sackett in 1989. Steiner sold these supplies on credit from 1989 until December 2008 or January 2009.

¶ 12       Delta also purchased supplies from Steiner. Maniscalco testified that, in 1999, he arranged for Delta to purchase natural gas generators from Steiner on credit, and Maniscalco signed a "Steiner Credit Application" defining the terms of sale. In 2005, Delta entered into

another credit application with Steiner. This credit application, which is included in the record on appeal, was signed by Maniscalco. The terms of the credit include:

"Confirmation of Information Accuracy and Release of Authority to Verify

\*\*\*

The applicant [Delta] agrees to make payments in accordance with Steiner's terms and conditions of sale as amended from time to time by Steiner, which are herein incorporated by reference, and 1.5% per month on past due invoices plus all reasonable costs of collection including attorney fees and expenses."

And:

"4. FINANCE CHARGES: Company reserves the right to charge 1.5% per month or 18% annually on all past due accounts. The customer shall be responsible for all costs of collection incurred by Company, including without limitation lien costs and all attorneys' fees and expenses."

Steiner's invoices to Delta, many of which appear in the record on appeal, include the following statement:

"1.5% per month finance charge will be added to all past due invoices. This is an annual rate of 18.00%"

¶ 13 Maniscalco testified that he alone controlled and supervised all of Delta's financial matters. Evidence presented at trial showed hundreds of thousands of dollars transferring between Delta and Maniscalco and Delta and Sackett. For example, between January 2005 and December 2008, Delta transferred $252,949 to Sackett via paper check or electronic transfers. Maniscalco and Sackett only produced invoices for these transactions totaling $41,472, substantiating payments from Delta to Sackett for purchases of materials, services,

and shared expenses. There were also back-and-forth transactions. For example, Maniscalco was asked at trial and unable to explain why $30,000 was transferred out of the Delta account and into the Sackett account and then transferred back to Delta one week later. Maniscalco also admitted to taking money for himself between 2005 and 2009, with no explanation as to why he did so.

¶ 14    Maniscalco testified at trial that he periodically loaned money to Delta and Delta Power, but did not execute promissory notes stating what the loan was for, or have any evidence that "shows where this money came from and where it went to."

¶ 15    The record includes a number of documents titled "action by sole director of: Delta Equipment Company," signed by Maniscalco as "the only director of said corporation." In one particular "action by sole director" dated May 1, 2002, a "shareholder loan" balance of $425,492 appears. The document notes:

> "I do further hereby acknowledge the loan payment in the amount of $5,690, which reduced the balance of $431,182 to $425,492 (a 5% change)."

This is the first indication of the loan itself. There is no indication why the loan was taken out, nor was there a promissory note or other documentation regarding the loan.

¶ 16    Maniscalco testified that Delta ceased operations in January 2009. A review of the "action by sole director of: Delta Equipment Company" dated May 1, 2009, however, fails to mention that Delta had ceased operations, nor does it provide any plans for winding up the business. Instead, it reflects that Maniscalco "nominate[d] and appoint[ed]" himself for president and his daughters for the positions of secretary, treasurer, and assistant treasurer, authorized and approved the purchase of a new van, and acknowledged a loan payment.

¶ 17    In January 2003, again in an "action by sole shareholder of: Delta Equipment Company," Maniscalco "spun off" Delta Power from Delta to be its own corporation. Prior to the spin off, as reflected in a Delta balance sheet dated December 31, 2002, and while Steiner was still one of its suppliers, Delta's assets totaled $1,626,400, and liabilities totaled $1,187,900. These liabilities included the $438,500 in undocumented claimed shareholder loans Maniscalco claims to have made to Delta. In the spin off, Maniscalco transferred $721,000 in assets to Delta Power, and $315,300 in liabilities, resulting in Delta Power having net assets of $405,800. In the spin off, Maniscalco neither transferred nor split the shareholder loan of $438,500, but kept it as Delta's exclusive liability. This resulted in Delta retaining $1,057,700 in assets, but $959,700 in liabilities. When asked at trial, Maniscalco was unable to explain why he allocated assets and liabilities in this manner.

¶ 18    In September 2005, Maniscalco sold Delta Power to another company, Alpine Power Systems, Inc., for $481,700. The sale included the name Delta Power Systems, trademarks, and goodwill. Maniscalco explained that the proceeds from the sale went to the shareholder of Delta, which was Maniscalco's family trust, of which he was the sole beneficiary.

¶ 19    Delta's financial situation appears to have been weakening throughout this time. It apparently lacked sufficient funds to pay rent to Maniscalco, as evidenced by an April 1, 2005 letter stating:

> "This is an agreement between Delta Equipment Company and Leonard J. Maniscalco
>
> The company has experienced a period of poor cash flow. The parties have made the following agreement to enable the company to continue with less strain on its financial position.

> Effective immediately, rent payments will be deferred for one year. At that time the payments will be reinstated and the parties will agree upon the payment schedule for deferred payments."

The letter is signed by Maniscalco as president of Delta and by Maniscalco as owner of the building.

¶ 20    Delta's corporate records and tax returns show negative retained earnings from 2004 until it closed. Delta eventually stopped paying Maniscalco's salary as an officer.

¶ 21    Forensic accountant John Bradley Sargent, Steiner's financial and accounting expert, reviewed various bank, financial, and other records of Maniscalco, Delta, and Sackett, spanning a five year period. Sargent testified to Delta's financial situation.[1] Sargent explained that he reviewed Delta's finances for the years 2005 through 2009. Regarding Delta's capitalization, he opined:

> "A. [WITNESS SARGENT:] Over that period their equity was negative— consistently negative, increasingly negative. They were negative income for the vast majority of that period, so I would characterize that capital assessment as very distressed.
>
> ***
>
> My opinion is that for the period that I reviewed, they were not adequately capitalized."

¶ 22    In Sargent's opinion, Delta, Sackett, and Maniscalco commingled funds. He described the series of money transfers wherein Maniscalco repeatedly moved $100,000 six times from himself, then to Sackett, then to Delta, and then back to Maniscalco. These transfers,

---

[1] Maniscalco and Sackett did not offer testimony from a financial expert.

according to Sargent, yielded substantial tax benefits to Sackett. Sargent described the transactions:

> "A. [WITNESS SARGENT:] [] This is a series of transactions that occurred in May of 2007. *** In May of 2007 Mr. Maniscalco deposited $100,000 into Sackett Systems. Sackett Systems transferred and deposited the $100,000 to Delta Equipment Company. Delta subsequently returned the $100,000 to Mr. Maniscalco. This transaction occurred six times, for a total of $600,000 in total transaction and impact, economic impact to the three entities.
>
> Q. And do you know what the purpose of this transaction was?
>
> A. Yes, I believe so.
>
> Q. And what do you believe the purpose of this transaction was?
>
> A. I believe that this transaction was intended to transfer Delta Equipment Company's substantial net operating loss to another entity operated by Mr. Maniscalco, primarily Sackett Systems, before Delta Equipment Company shut its doors."

¶ 23    Sargent explained that net operating loss is "a tax concept where businesses that are losing money in their operations can accumulate these losses and use them to offset operating gains in either future periods or prior periods." Sargent also explained that Delta's financial statements indicated it received $600,000 in management fee income, while Sackett's financial statements and tax returns indicated that it paid $600,000 in business expense and management fees to Delta. According to Sargent, Delta did not pay any tax for the $600,000 management fee and there was no documentation regarding the fee. Sargent further explained that the money eventually was returned to Maniscalco, where "accounting wise it

was treated to reduce a loan from the Shareholder, Maniscalco, on Delta's books. So they reduced a liability. They got $600,000 in management fee income, and they used it to pay off Mr. Maniscalco, and reduce the loan from the shareholder." In other words, Sackett was a profitable corporation and Maniscalco and his accountant initiated a series of transactions that created the false appearance of management services in order to minimize Sackett's tax burden.

¶ 24     Regarding the suspect $600,000 management fee, Maniscalco testified that, on six occasions, he transferred $100,000 from his bank account at MB Financial Bank to Sackett's MB bank account as loans. He did not create any sort of promissory notes for these loans, nor was there a resolution by Sackett authorizing it to borrow money from him. He testified that, as president of Sackett, he would review financial records, pay bills, and oversee the general operations of the business. Oddly, while Maniscalco testified that he was the Delta employee paid to provide the management services to Sackett which, according to Maniscalco, were "[j]ust the upper management portion" of the business, he also agreed that these services were the same services he was already providing as president of Sackett.

¶ 25     There was no written agreement between Delta and Sackett regarding the $600,000 worth of management services. Maniscalco agreed that, once the money was in the Sackett account, he "had Sackett pay that money to Delta." There was no written agreement detailing the existence of these loans. The money was then transferred back to Maniscalco, again with no written agreement or indication that the money was repayment for a loan.

¶ 26     Sargent testified that this management fee scheme violated the Economic Substance Doctrine as codified in section 7701 of the Internal Revenue Code of 1986 (26 U.S.C. § 7701 *et seq.* 2012), because the transactions had no meaningful impact on the economic positions

of the parties, but only served to effect an income tax savings for Sackett. Sargent described the Economic Substance Doctrine:

"A. [WITNESS SARGENT:] The Economic Substance Doctrine basically states, in lay terms, that there's got to be a real reason for a financial transaction; that that transaction has to have, as the doctrine states, 'a real economic substance outside of tax consequences.' "

In written form, section 7701 provides:

"(o) Clarification of economic substance doctrine.

(1) Application of Doctrine.

In the case of any transaction to which the economic substance doctrine is relevant, such transaction shall be treated as having economic substance only if - -

(A) the transaction changes in a meaningful way (apart from Federal income tax effects) the taxpayer's economic position, and

(B) the taxpayer has a substantial purpose (apart from Federal income tax effects) for entering into such transaction." 26 U.S.C. § 7701(o)(1).

¶ 27      Paul Adank, who was Delta's general manager at the time of the $600,000 management fee transactions, testified he was unaware of any management services having been provided. He denied that he was aware of any services that Delta provided to Sackett at that time, or that anyone from Delta provided management services to Sackett. Neither Delta's nor Sackett's corporate records refer to any management agreement.

¶ 28    Sargent also testified that he found one more instance of commingling of funds in a bank account held by both Delta and Sackett. The bank account information identified both companies as holders of the account, banking information was mailed to both names, and Sargent identified both incoming and outgoing transactions from both entities.

¶ 29    During the times at issue, Adank was the Delta general manager, overseeing Delta's sales, service, and relationships with Steiner and Kohler. Kohler manufactured power generators which Steiner sold to Delta. Delta then sold and serviced those generators. The working relationship between Steiner, Kohler, and Adank was good. Adank testified that Delta, Steiner, and Kohler formed a "co-op" to assist in advertising and coalesce leads to gain customers. With the help of Steiner and Kohler, between 2002 and 2009, Delta's customer base grew from no customers to an average of an additional 80 to 90 customers per year. Additionally, Adank testified that Kohler and Steiner provided training regarding product familiarity, installation recommendations, and equipment updates to Delta.

¶ 30    By November 2008, Delta had stopped paying its invoices to Steiner and owed Steiner approximately $200,000. Steiner made multiple offers over the next two months offering, for example, extended payment plans, installment plans, and to restructure the parties' credit terms. No agreement was reached, however, and Steiner eventually filed mechanic's liens in late December 2008 in the amounts of $33,371; $4,791; $4,791; $4,791; $3,143, in relation to the sale of generators to Delta for which Delta had failed to pay Steiner. Delta paid some of the liens. Maniscalco testified that, immediately after he received notice of the liens, he "just felt that we were not going to be able to continue business." He informed Adank, telling him, "I think we're probably going to have to go out of business because of these [lien] notices going out."

¶ 31        Maniscalco testified that he did not attempt to purchase generators from any other manufacturers or distributors other than Steiner, even though Steiner was no longer selling to Delta. Instead, when Delta closed later that year, it had to return customer deposits for generator orders it had failed to fill.

¶ 32        At the same time in January 2009, with Delta's relationship with Steiner soured, Maniscalco also terminated Sackett's business relationship with Steiner.

¶ 33        After Maniscalco closed Delta, Adank and Maniscalco's daughter started a new company called MPower. MPower opened in February 2009, and sold the same Kohler natural gas generators that Delta had sold. Adank took Delta's customer list that had been developed with Steiner's assistance with him to MPower. Adank testified that he used the Delta customer sales data when he opened MPower. He testified that MPower has 471 active accounts that originated from the Delta customer list. At the time of trial, MPower's customers that were gleaned from the Delta customer list made up approximately 50% of MPower's business. Financial expert Sargent estimated the value of the customer list to be upwards of $200,000.

¶ 34        Maniscalco testified that he was aware Adank had Delta's laptop computer with all of Delta's customer information stored on it, but did not instruct Adank that he should leave behind any customer data that belonged to Delta. In fact, Maniscalco testified that he never told Adank to stop using Delta's customer data. Nor did Maniscalco ask Adank to pay for the customer information, which information included customer identification information, generators they had purchased, and the nature and timing of the service Delta had provided to them.

¶ 35        In April 2009, Steiner filed suit against Delta for unpaid invoices and interest, relying on the terms of the credit application and invoices governing Delta's purchases from Steiner. Thereafter, in August 2009, the circuit court entered a default judgment against Delta in the amount of $226,687 (the Delta judgment). This amount represented $184,150 in product costs, $35,919 in accrued interest, $1,065 in lien fees, and $5,552 in attorney fees and costs. Delta has not paid Steiner any money toward satisfaction of this judgment.

¶ 36        Steiner then filed suit to collect the Delta judgment, specifically asking the circuit court to pierce the corporate veil of Maniscalco and Sackett, such that Maniscalco and Sackett would be held liable for the Delta judgment.

¶ 37        Following a multi-day trial, the trial court entered its June 18, 2013 order, piercing the corporate veil to hold Maniscalco and Sackett liable to Steiner for the Delta debt (the June order). In its memorandum order, the trial court considered factors in the veil-piercing analysis. It also made various findings of fact, including that Maniscalco was the "sole owner, director and functioning officer at Sackett as well as Delta." The court stated:

> "[T]he evidence showed that there was a $600,000 management fee, which resulted in the commingling of funds between the corporations. The court has considered the substance of the relationship between Mr. Maniscalco and the corporations. He admittedly had the final word on decisions. The $600,000 transfer was one prime example of commingling of funds. It was also established that Delta and Sackett had a joint checking account. The corporations had rental agreements that were not adequately memorialized. Further, and of some significance, the testimony of the parties revealed that Mr. Maniscalco closed Delta when he became frustrated at Steiner's filing of liens. It was apparent to the

court that Delta allowed the corporation to become dissolved in large part due to the potential debt problems it faced with Steiner, thus taking the position that it could avoid its potential financial obligation to Steiner. The evidence further showed that Mr. Maniscalco had valued the customer service list and had taken consideration for same in prior corporate dealings. This interest in the customer service list was abandoned when Delta shut down and Mpower was created. These inconsistencies on how the customer service list was treated further showed that Delta wanted to avoid payment to Steiner."

In its motion, Steiner had requested collection of finance charges and attorney fees or, in lieu of that, then collection of postjudgment interest. The court denied Steiner's request for fees and finance charges, and was silent on the issue of postjudgment interest.

¶ 38 Steiner filed a motion to reconsider the issues of finance charges and attorney fees, as well as the collection of postjudgment interest. In October 2013, the court found Sackett and Maniscalco liable to Steiner for postjudgment interest accruing on the Delta judgment, as well as for Steiner's litigation fees, expenses, and costs, but denied Steiner's request for attorney fees (the October order).

¶ 39 In December 2013, the circuit court entered judgment *nunc pro tunc* in Steiner's favor and against Maniscalco and Sackett, jointly and severally, for $387,403, representing the Delta judgment of $226,686, statutory interest accrued to the Delta judgment in the amount of $88,601, and Steiner's litigation expenses and costs of $72,115.

¶ 40 Maniscalco and Sackett appeal the judgment against them. In a separate appeal, Steiner appeals the circuit court's decision not to award the postjudgment attorney fees incurred in this action. These appeals have been consolidated.

15

¶ 41                                    II.  ANALYSIS

¶ 42                         A.  Appeal Nos. 1-13-2023 & 1-13-2024

¶ 43           On appeal, Maniscalco and Sackett contend the circuit court erred in piercing the corporate veil and holding them liable for the Delta judgment.  Specifically, Maniscalco and Sackett argue that the circuit court erred by:  (1) holding Maniscalco liable for Delta's debt to Steiner where there is no unity of ownership between Maniscalco and Delta; and (2) holding Sackett liable for Delta's debt to Steiner where there is no unity of ownership between it and Delta.  Maniscalco and Sackett also contend there would be no injustice in preserving the corporate entities here.  We disagree.

¶ 44           "A corporation is a legal entity separate and distinct from its shareholders, directors, and officers."  *In re Rehabilitation of Centaur Insurance Co.*, 158 Ill. 2d 166, 172 (1994). This applies even where one of the corporations wholly owns the other and the two corporations have mutual dealings.  *In re Rehabilitation of Centaur Insurance Co.*, 158 Ill. 2d at 172.

¶ 45           Generally, corporate officers and directors are not individually liable for the debts and obligations of the company, but in certain situations, courts will find them personally liable for a corporation's obligations through the equitable remedy known as piercing the corporate veil.  *Ted Harrison Oil Co. v. Dokka*, 247 Ill. App. 3d 791, 794-95 (1993); *Fontana v. TLD Builders, Inc.*, 362 Ill. App. 3d 491, 500 (2005) ("A primary purpose of doing business as a corporation is to insulate stockholders from unlimited liability for corporate activity."). Piercing the corporate veil is a remedy that permits aggrieved plaintiffs to attach liability to the "individual or entity that uses a corporation merely as an instrumentality to conduct that person's or entity's business."  *Fontana*, 362 Ill. App. 3d at 500.  Therefore, where the

corporation is merely the alter ego or business conduit of the person responsible for damages, a court may disregard the corporate entity and pierce the corporate veil to impose liability on that person. *Peetoom v. Swanson*, 334 Ill. App. 3d 523, 527 (2002).

¶ 46     This court recently described the process of piercing the corporate veil in order to find a shareholder or officer liable for the corporation's obligations:

"Despite the haze surrounding veil-piercing, Illinois courts have developed fairly uniform rules on the subject. *** Courts may pierce the corporate veil *** where the corporation is so organized and controlled by another entity that maintaining the fiction of separate identities would sanction a fraud or promote injustice. *Id.* at 527. A party seeking to pierce the corporate veil must make a substantial showing that one corporation is a dummy or sham for another. *In re Estate of Wallen*, 262 Ill. App. 3d 61, 68 (1994).

Illinois courts will pierce the corporate veil 'where: (1) there is such a unity of interest and ownership that the separate personalities of the corporation and the parties who compose it no longer exist, and (2) circumstances are such that adherence to the fiction of a separate corporation would promote injustice or inequitable circumstances.' *Tower Investors[, LLC v. 111 East Chestnut Consultants, Inc.*, 371 Ill. App. 3d 1019, 1033 (2007)]." *Buckley v. Abuzir*, 2014 IL App (1st) 130469, ¶ 12.

¶ 47     "In determining whether the 'unity of interest and ownership' prong of the piercing-the-corporate-veil test is met, a court generally will not rest its decision on a single factor, but will examine many factors, including: (1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5)

insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among related entities; and (11) whether, in fact, the corporation is a mere façade for the operation of the dominant stockholders." *Fontana*, 362 Ill. App. 3d at 503.

¶ 48    Under the second prong of the veil-piercing test, the court must determine "whether the circumstances are such that adherence to the fiction of a separate corporation would promote injustice or inequitable circumstances." *Buckley*, 2014 IL App (1st) 130469, ¶ 34; *Fontana*, 362 Ill. App. 3d at 507 (the second prong of the test requires an inquiry into whether there is an element of unfairness, such as fraud or deception, or the existence of a compelling public interest).

¶ 49    On review, we will only reverse the finding of the circuit court regarding piercing the corporate veil if it is against the manifest weight of the evidence. *Fontana*, 362 Ill. App. 3d at 500.  A decision is against the manifest weight of the evidence when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary or not based on the evidence. *Bank of America v. WS Management, Inc.*, 2015 IL App (1st) 132551, ¶ 84. " 'In a bench trial, it is the function of the trial judge to weigh the evidence and make findings of fact' and we may 'not substitute [our] judgment for that of the trier of fact.' " *Bank of America*, 2015 IL App (1st) 132551, ¶ 84 (quoting *Falcon v. Thomas*¸ 258 Ill. App. 3d 900, 909 (1994)).  This court will not overturn a trial court's judgment as long as there is evidence to support it.  See *Bank of America*, 2015 IL App (1st) 132551, ¶ 84.  Moreover, this court may " 'affirm the judgment of the trial court on any basis in the record, regardless of whether

the trial court relied upon that basis or whether the trial court's reasoning was correct.' " *Bank of America*, 2015 IL App (1st) 132551, ¶ 84 (quoting *Northwestern Memorial Hospital v. Sharif*, 2014 IL App (1st) 133008, ¶ 25).

¶ 50                                      1.  Liability as to Maniscalco

¶ 51        We first consider the factors regarding the "unity of ownership" between Maniscalco and Delta.  That is, we consider whether there was:  "(1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among related entities; and (11) whether, in fact, the corporation is a mere façade for the operation of the dominant stockholders." *Fontana*, 362 Ill. App. 3d at 503.  Maniscalco and Sackett properly concede that factors 4 (nonpayment of dividends), 5 (insolvency of debtor corporation), and 6 (nonfunctioning of the other officers or directors) weigh in favor of piercing the corporate veil.  We thus consider the remaining factors.

¶ 52        Regarding the first factor, whether there was adequate capitalization, we find that Delta was inadequately capitalized.  Specifically, the evidence adduced at trial showed Maniscalco failed to deposit unencumbered capital to Delta, as demonstrated by Maniscalco's testimony that when he incorporated Delta, he did not contribute any unencumbered capital, but rather loaned $10,000 to Delta upon incorporation.  He periodically loaned it additional money thereafter, though without proper documentation.  See *Fontana*, 362 Ill. App. 3d at 504 ("The consideration of whether a corporation is adequately capitalized is based on the policy that

19

shareholders should in good faith put at the risk of the business unencumbered capital reasonably adequate for the corporation's prospective liabilities. *Fiumetto v. Garrett Enterprises, Inc.*, 321 Ill. App. 3d 946, 959 (2001). It is inequitable to allow shareholders to set up a flimsy organization just to escape personal liability. *Fiumetto*, 321 Ill. App. 3d at 959."). Moreover, forensic accountant Sargent, the only financial expert to testify at trial and who reviewed various bank, financial, and other records of Maniscalco, Delta, and Sackett spanning a five year period, testified that Delta was undercapitalized. He noted Delta's "consistently" and "increasingly" negative equity and income over the time period he reviewed. Additionally, Delta's 2004 to 2008 tax returns, included in the record on appeal, show Delta had negative retained earnings each year. The first factor weighs in favor of piercing the corporate veil.

¶ 53        As to the second factor, the issuance of stock, Delta did issue stock, but apparently only to Maniscalco. This factor is neutral in our analysis.

¶ 54        With respect to Maniscalco's failure to observe corporate formalities, the record is clear that Maniscalco and his corporations did not properly observe corporate formalities where Maniscalco failed to elect a vice president and *bona fide* officers of the corporation and failed to document financial transactions. Maniscalco claims, for instance, that he loaned large amounts of money to his companies with no promissory note or indication of what the loans were for or how they would be repaid. Additionally, at trial, Maniscalco admitted that although the Delta corporate bylaws require the corporation to have a vice president, he neither elected nor appointed a vice president. The record also shows that the $600,000 "management fee" agreement by which six transactions of $100,000 each were made within a 21-day period from Maniscalco to Sackett to Delta and finally back to Maniscalco for alleged

managerial consultations from Maniscalco himself were never memorialized in a written agreement. In fact, even Sackett's general manager, Adank, denied having known that $600,000 worth of managerial consultation was being provided his company. Additionally, the corporate minute book is silent as to Delta ceasing operations, winding up, and liquidating the business. This factor weighs in favor of piercing the corporate veil.

¶ 55    Maniscalco has properly conceded that factors 4 (nonpayment of dividends), 5 (insolvency of debtor corporation), and 6 (nonfunctioning of the other officers or directors) weigh in favor of piercing the corporate veil. We note briefly that Delta did not pay out dividends; Delta, the debtor corporation, is insolvent; and Maniscalco's daughters did not truly function as officers of Delta. Therefore, we will not consider those factors in detail here.

¶ 56    Regarding the seventh factor, the absence of corporate records, the circuit court based its finding that this factor weighed in favor of piercing the corporate veil on two criteria: (1) "There was no management fee in writing;" and (2) "The corporations had rental agreements that were not adequately memorialized." As noted previously, Delta's corporate records were incomplete, promissory notes were not prepared and executed for the many loans allegedly made between Maniscalco and the corporation, and, even if this court were to believe that the Maniscalco-Sackett-Delta-Maniscalco management fee agreement was just that—a management fee agreement rather than a tax evasion scheme—we would still find that it weighed in favor of piercing the corporate veil because it was not documented in the corporate records. The circuit court's finding that the absence of corporate records weighed in favor of piercing the corporate veil is not against the manifest weight of the evidence.

¶ 57        The eighth factor, the commingling of funds, also weighs in favor of piercing the corporate veil. It was established at trial that Delta and Sackett, both headed by Maniscalco, held a joint bank account. Financial expert Sargent testified to deposits and withdrawals from both companies going in and out of the one account. In addition, the management fee scheme during which six transactions of $100,000 each were sent from Maniscalco to Sackett to Delta and back to Maniscalco evidenced commingling of funds. Maniscalco argues that the $600,000 management fee was but one instance of commingling, and, therefore, should be disregarded by the court, stating, "One instance over five years of business operations does not a case of commingling make." This argument is unpersuasive. Instead, Maniscalco transferred money on multiple occasions for no official corporate reason, that is, there was no written agreement and no managerial services actually rendered, and the purpose of the transactions appears to have been to further a tax evasion scheme. The monies transferred between Maniscalco and both corporations, with Maniscalco, the sole connection between the companies, acting as the companies' alter ego, and was, therefore, commingled. The circuit court's finding that the commingling of funds weighed in favor of piercing the corporate veil is not against the manifest weight of the evidence.

¶ 58        The ninth factor, the diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors, also weighs in favor of piercing the corporate veil. In this regard, the circuit court noted:

       "Essentially, generators were sold to Delta, and when Steiner did not receive payment, Steiner exercised its lien rights, placing liens with the new purchasers of the generators. This apparently greatly distressed Mr. Maniscalco who shortly thereafter made a decision to dissolve Delta and allow his son-in-law,

22

Paul Adank, [to] take over the business (a newly renamed Mpower). In so doing, Mr Maniscalco closed Delta's doors and either gifted or with some indifference, allowed Mr. Adank to utilize the customer list of Delta along with other valuable assets of Delta.

\* \* \*

Based on the totality of the testimony of Mr. Adank and Mr. Maniscalco, this court finds that the customer list had great value, was instrumental to the success of Mpower and [neither] Mr. Maniscalco nor Delta received any monetary value or any consideration from said list.

\*\*\*

The evidence further showed that Mr. Maniscalco had valued the customer service list and had taken consideration for same in prior corporate dealings. This interest in the customer service list was abandoned when Delta shut down and Mpower was created. These inconsistencies on how the customer service list was treated further show that Delta wanted to avoid payment to Steiner."

We, also, conclude that Maniscalco diverted assets to himself and to his son-in-law both without compensation and to Steiner's detriment. The customer information, created in conjunction with Steiner over a period of years, was a valuable corporate asset. Financial expert Sargent valued it at over $200,000. Adank testified that he started his business, MPower, using the names and information from this customer list, and then had 471 clients he carried with him or gleaned from the list. At a time when Delta had outstanding debt to Steiner, Maniscalco allowed Adank to take the information, a valuable asset to the corporation, at no charge and use it in his new business, thereby curtailing any possibility

23

that the value of the customer list could offset debt to its creditor, Steiner. This was to Steiner's detriment and weighs in favor of piercing the corporate veil.

¶ 59       The tenth factor, the failure to maintain an arm's-length relationship among related entities, also weighs in favor of piercing the corporate veil. The management fee scheme in which Maniscalco orchestrated sham transactions by which he first loaned Sackett money and then he, acting as Delta's president, transferred that money to Delta, and then he, acting as Sackett's president, transferred it back to himself illustrates Maniscalco's failure to maintain an arm's-length relationship among related entities. Additionally, Maniscalco repeatedly borrowed and loaned money to the companies with no documentation or promissory notes, also evidencing a failure to maintain an arm's-length relationship.

¶ 60       Finally, we find the eleventh factor, whether the corporation is a mere façade for the operation of the dominant stockholders, to be, at most, neutral in determining whether it is appropriate to pierce the corporate veil. Maniscalco argues that Delta and Maniscalco had separate bank accounts; there is no evidence Maniscalco used Delta's funds to finance his personal expenses; and Delta and Sackett each had their own employees. While this may be true, this court is cognizant of the fact that Maniscalco appears to have treated his corporations as mere extensions of himself, lending and borrowing money at will and with no corporate documentation. At most this factor is neutral in our veil-piercing analysis.

¶ 61                                   2. Liability as to Sackett

¶ 62       We next consider whether the circuit court erred in determining that Sackett should be liable for the Delta judgment. "[I]f one corporation is merely a dummy or sham [for another corporation], the distinct corporate entit[ies] will be disregarded and the two corporations will be treated as one." *Walker v. Dominick's Finer Foods, Inc*., 92 Ill. App. 3d 645, 649

24

(1980). Our supreme court has noted: "[T]he doctrine of piercing the corporate veil is not limited to the parent and subsidiary relationship; the separate corporate identities of corporations owned by the same parent will likewise be disregarded in an appropriate case." *Main Bank of Chicago v. Baker*, 86 Ill. 2d 188, 205 (1981). Such proper circumstances exist when "one corporation so controls the affairs of another that the other is the mere instrumentality or dummy of the former and that, under the circumstances, the observance of the fiction of separate corporate existences would sanction a fraud or promote injustice." *Logal v. Inland Steel Industries, Inc.*, 209 Ill. App. 3d 304, 309 (1991).

¶ 63     Here, Maniscalco owned, controlled, and was the sole shareholder of both Sackett and Delta. The record is replete with examples in which Delta was a mere instrumentality or dummy for Sackett. For example, Delta's and Sackett's dealings with one another were often not properly documented. As discussed above, the management fee scheme in which money was transferred from Maniscalco to Sackett to Delta and back to Maniscalco was not properly documented in the corporate records of either Delta or Sackett. There was no contract regarding the management fee of $600,000, and even Delta's general manager, Adank, was unaware of the fee or the services allegedly provided. Additionally, that Maniscalco, who directed the management fee scheme, (1) was the president of both Delta and Sackett, (2) had the decision-making authority in both companies, and (3) paid himself as a Delta employee to provide the alleged management services, further evidences that these corporations should properly be treated as one corporation.

¶ 64     Moreover, as discussed above, financial expert Sargent testified to the commingling of funds in a joint account held by Delta and Sackett. Sargent testified that funds were both deposited and withdrawn by both Delta and Sackett. Delta and Sackett's funds were

commingled such that the distinct corporate entities should be disregarded and the two corporations should be treated as one. See *Walker*, 92 Ill. App. 3d at 649.

¶ 65 As seen here, as well as in the above discussion, Maniscalco consistently treated both Delta and Sackett in such a manner that both companies were, in practice, Maniscalco's alter egos. As noted above, a reviewing court will not base its determination on a single factor, but will consider all of the piercing factors. *Fontana*, 362 Ill. App. 3d at 503. We have done so, and find that the majority of the factors weigh in favor of piercing the veil and the remaining factors are, at most, neutral. The circuit court's determination that there was such a "unity of interest and ownership that the separate personalities of the corporation and the parties who compose it no longer exist" in its analysis regarding the piercing of the corporate veil is not against the manifest weight of the evidence. See *Buckley*, 2014 IL App (1st) 130469, ¶ 12.

¶ 66 3. Not Allowing the Veil-Piercing Would Promote Injustice or Perpetuate a Fraud or Deception

¶ 67 Maniscalco and Sackett next argue that there is no injustice in preserving the corporate entities here. We disagree. We find that, even if Steiner had been unable to show the requisite unity of interest and ownership, the circumstances in this case are such that adherence to the fiction of separate entities would promote injustice or inequality. See *Fontana*, 362 Ill. App. 3d at 500 (under the second veil-piercing prong, we must determine whether the circumstances are such that adherence to the fiction of a separate corporation would promote injustice or inequitable circumstances). "Specifically, we must ask whether there is some unfairness, such as fraud or deception, or the existence of a compelling public interest that justifies piercing." *Buckley*, 2014 IL App (1st) 130469, ¶ 34.

¶ 68      In the case at bar, we find that not holding Maniscalco and Sackett liable for the Delta judgment would be unfair where the evidence showed that Maniscalco closed Delta in response to Steiner's refusal to abandon its contractual rights. Specifically, Maniscalco slowly stripped Delta of its finances, including the spin off and eventual sale of Delta Power. Then Delta, through Maniscalco, failed to honor its contractual obligations when it refused to pay its invoices to Steiner for generators Steiner had sold Delta. Steiner demanded payment. Delta continued to refuse. Steiner offered various settlement plans in order to help Delta, including extended payment plans, installment plans, and restructuring the parties' credit terms. Delta continued to refuse. Steiner finally filed mechanic's liens against previously sold generators. When Maniscalco received notice of the liens, he made the decision to close Delta. Allowing this corporate malfeasance to be protected by corporate limited liability would be unjust.

¶ 69      We also find that not holding Maniscalco and Sackett liable for the Delta judgment would sanction a fraud or deception, where financial expert Sargent testified regarding the management fee scheme, which was entered into for tax evasion purposes and was a fraudulent and deceptive practice. See *Fontana*, 362 Ill. App. 3d at 507 (the relevant inquiry is whether there is some unfairness, such as fraud or deception, or the existence of a compelling public interest that justifies the piercing).

¶ 70      The decision of the circuit court to pierce the corporate veil and hold Maniscalco and Sackett liable for the Delta judgment was not against the manifest weight of the evidence. See *Bank of America,* 2015 IL App (1st) 132551, ¶ 84 (a decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings

27

appear to be unreasonable, arbitrary or not based on the evidence). We therefore affirm that judgment.

¶ 71                              B. Appeal No. 1-14-0083

¶ 72        In this consolidated appeal, appellant Steiner asks this court to reverse the circuit court's denial of postjudgment attorney fees incurred in the supplemental proceeding against Delta and in the veil-piercing action. Specifically, Steiner argues that, where the circuit court entered judgment against Delta and in favor of Steiner, including awarding Steiner his contractual attorney fees, and in a separate cause, the court pierced the corporate veil to find Maniscalco and Sackett liable for the Delta judgment, Steiner should be awarded its post-judgment attorney fees incurred in enforcing the Delta judgment. For the following reasons, we agree.

¶ 73        The parties have not cited an Illinois case directly on point, and our research has not uncovered one. As an issue of first impression, we conclude here that a fair reading of the terms of the contract, which provide that the customer was liable for "all reasonable costs of collection including attorney fees and expenses" and "[t]he customer shall be responsible for all costs of collection incurred by Company, including without limitation lien costs and all attorneys' fees and expenses," shows that the terms were broad enough to embrace the expenses incurred by Steiner in a subsequent suit to enforce the judgment under that contract. See, *e.g.*, *Centerpoint Energy Services, Inc. v. Halim*, 743 F.3d 503, 508 (7th Cir. 2014).

¶ 74        "The doctrine of piercing the corporate veil is an equitable remedy; it is not itself a cause of action but rather is a means of imposing liability on an underlying cause of action, such as a tort or breach of contract." *Peetoom*, 334 Ill. App. 3d at 527. When a judgment has been obtained against a corporation, parties may bring a separate suit to pierce the corporate

28

veil in order to enforce the original judgment. *Buckley*, 2014 IL App (1st) 130469, ¶ 9 (collecting cases).

¶ 75 In Illinois, the prevailing party will generally bear the costs of litigation unless otherwise provided for in a statute or by agreement between the parties. *Brundidge v. Glendale Federal Bank, F.S.B.*, 168 Ill. 2d 235, 238 (1995); *Fontana*, 362 Ill. App. 3d at 510 (" 'Illinois generally follows the "American Rule":  Absent statutory authority or a contractual agreement between the parties, each party to litigation must bear its own attorney fees and costs[, and may not recover those fees and costs] from an adversary.' " (quoting *Morris. B. Chapman & Associates, Ltd. v. Kitzman*, 193 Ill. 2d 560, 572 (2002)).  There must be specific language in the contract for a court to award attorney fees as a matter of contractual construction. *Fontana*, 362 Ill. App. 3d at 510.  Where, as here, the circuit court determined the question of attorney fees as a matter of law, the issue on appeal is a question of law which we review *de novo*, unrestrained by the circuit court's judgment.  See *Pietrzyk v. Oak Lawn Pavilion, Inc.*, 329 Ill. App. 3d 1043, 1047 (2002) (applying *de novo* standard of review where plaintiff was not disputing circuit court's calculations of attorney fees, but was contending only that the circuit court misapplied the law).

¶ 76 Appellees Maniscalco and Sackett have not filed an appellee brief.  Accordingly, our review is governed by *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976), in which our supreme court "set forth three distinct, discretionary options a reviewing court may exercise in the absence of an appellee's brief:  (1) it may serve as an advocate for the appellee and decide the case when the court determines justice so requires, (2) it may decide the merits of the case if the record is simple and the issues can be easily decided without the aid of the appellee's brief, or (3) it may reverse the trial court when the

29

appellant's brief demonstrates *prima facie* reversible error that is supported by the record." *Thomas v. Koe*, 395 Ill. App. 3d 570, 577 (2009) (citing *Talandis*, 63 Ill. 2d at 133). We choose to address the issue here because it falls under the second category, that is, the record is simple and the issue can easily be decided without the aid of the appellee's brief.

¶ 77     Here, as noted above, Maniscalco owned both Delta and Sackett. Both Delta and Sackett purchased supplies from Steiner. Maniscalco testified that, in 1999, he arranged for Delta to purchase natural gas generators from Steiner on credit, and Maniscalco signed a "Steiner Credit Application" defining the terms of sale. In 2005, Delta entered into another credit application with Steiner. This credit application, which is included in the record on appeal, was signed by Maniscalco. The terms of the credit contract include:

"Confirmation of Information Accuracy and Release of Authority to Verify

\*\*\*

The applicant [Delta] agrees to make payments in accordance with Steiner's terms and conditions of sale as amended from time to time by Steiner, which are herein incorporated by reference, and 1.5% per month on past due invoices plus all reasonable costs of collection including attorney fees and expenses."

And:

"4. FINANCE CHARGES: Company reserves the right to charge 1.5% per month or 18% annually on all past due accounts. The customer shall be responsible for all costs of collection incurred by Company, including without limitation lien costs and all attorneys' fees and expenses."

¶ 78     In April 2009, Steiner filed suit against Delta for unpaid invoices and interest, relying on the terms of the credit application and invoices governing Delta's purchases from Steiner.

Thereafter, in August 2009, the circuit court entered a default judgment against Delta in the amount of $226,687. The award included attorney fees. Delta has not paid Steiner any money toward satisfaction of this judgment.

¶ 79    After pursuing postjudgment proceedings against Delta, including extensive discovery of its financial records, Steiner filed suit to collect the Delta judgment, specifically asking the circuit court to pierce the corporate veil of Maniscalco and Sackett, such that Maniscalco and Sackett would be held liable for the Delta judgment. The court did so. The court denied Steiner's request for fees and finance charges without making any specific findings or legal holdings in relation to Steiner's rights to recover those fees and charges.

¶ 80    Steiner filed a motion to reconsider the issues of finance charges and attorney fees, as well as the collection of postjudgment interest. Maniscalco and Sackett, in their response to the motion to reconsider, argued that the circuit court did not have jurisdiction to consider the motion, that they should have the opportunity to challenge the terms of the underlying contract, and that the merger doctrine bars recovery based on the terms of the underlying contract where the underlying contract did not specifically provide for postjudgment attorney fees.

¶ 81    In its October order, the court found Sackett and Maniscalco liable to Steiner for post-judgment interest accruing on the Delta judgment, as well as for Steiner's litigation fees, expenses, and costs, but denied Steiner's request for attorney fees. Specifically, the court stated:

> "Next, addressing [Steiner's] argument for attorney's fees, it is well settled Illinois Law that in the absence of specific statutory authority or some agreement or stipulation specially authorizing them, attorney fees and other ordinary

expenses and burdens of litigation may not be awarded, either in law or in equity. *Sanelli v. Glenview State Bank*, 126 Ill. App. 3d 411, 415 (1st Dist. 1984). [Steiner was] granted attorney's fees in the underlying case in obtaining a default judgment. Same were presumably awarded pursuant to the contract agreement. In the instant cause, no such contractual agreement for attorney's fees exists. In the absence of specific statutory authority or some agreement or stipulation specially authorizing them, attorney's fees and other ordinary expenses and burdens of litigation may not be awarded, either in law or in equity. (*Chicago Title & Trust Co. v. Walsh* (1975), 34 Ill. App. 3d 458). This court finds that in the spirit of promoting an equitable outcome, [Steiner's] request for attorney's fees and finance charges are DENIED."

¶ 82    In December 2013, the circuit court entered judgment *nunc pro tunc* in Steiner's favor and against Maniscalco and Sackett, jointly and severally, for $387,403, representing the Delta judgment of $226,686, statutory interest accrued to the Delta judgment in the amount of $88,601, and Steiner's litigation expenses and costs of $72,115. The court did not further address the issue of attorney fees.

¶ 83    On appeal, Steiner directs this court to a Second District case, *Fontana v. TLD Builders, Inc.*, wherein this court, in pertinent part, awarded the plaintiff attorney fees against a defendant in a veil-piercing claim based upon the underlying contract providing that a plaintiff may recover such fees. *Fontana*, 362 Ill. App. 3d at 509-10. In *Fontana*, homeowners brought a breach of contract action against the corporate contractor and the architect for failing to perform their obligations under a construction contract. *Fontana*, 362 Ill. App. 3d at 494. In the same breach of contract action, the plaintiff homeowners also

sought to pierce the corporate veil of the building contractor to hold the husband-wife owners, the DiCosolas, personally liable for the damages. *Fontana*, 362 Ill. App. 3d at 494-95. The circuit court found the evidence sufficient to pierce the corporate veil, and calculated damages in favor of the homeowners and against the building contractor and the DiCosalas, jointly and severally. *Fontana*, 362 Ill. App. 3d at 495. Following the entry of judgment in their favor, the homeowners filed a motion seeking an award of prejudgment attorney fees based on a provision in the contract allowing for an award of "reasonable expense" incurred in its enforcement. *Fontana*, 362 Ill. App. 3d at 510. That contract provision provided:

> "To the extent Builder or Purchaser fails to comply with provisions of this Contract, the other party may retain an attorney to assist it in the enforcement of the provisions of this Contract, and the party at fault (i.e., not in compliance with the provisions of this Contract), shall pay any and all reasonable expense relating to the enforcement of the provisions of this Contract." *Fontana*, 362 Ill. App. 3d at 509.

¶ 84    The *Fontana* court framed the issue, stating "[w]e are then left with the issue of whether the language 'any and all reasonable expense relating to enforcement' in [the contract section] specifically includes attorney fees." *Fontana*, 362 Ill. App. 3d at 510. In its analysis, the court stated that Illinois cases "stop short of holding that use of the term 'attorney fees' is required." *Fontana*, 362 Ill. App. 3d at 510. The *Fontana* court ruled that a written contract which lacked the express term "attorney fees" could be nonetheless interpreted to include "amounts paid to an attorney retained to 'assist in the enforcement of the provision of [the] contract.' " *Fontana*, 362 Ill. App. 3d at 511. The *Fontana* court held

that the term "attorney fees" need not be included in order for the prevailing party to collect fees; rather this determination depends upon whether the recovery of attorney fees was intended by the parties. *Fontana*, 362 Ill. App. 3d at 510. The court remanded the cause, directing the circuit court to determine what amount of fees was reasonable. *Fontana*, 362 Ill. App. 3d at 511.

¶ 85　　　Steiner argues that its position in the case at bar is even stronger than the *Fontana* plaintiff's case because the contract here uses the specific terms "attorneys' fees and expenses." While we find *Fontana* instructive to the issue of whether attorney fees should properly be awarded when those fees are incurred in a veil-piercing action, we think Steiner's conclusion is a stretch of the *Fontana* ruling. The *Fontana* court's analysis with regard to the attorney fee issue was limited to a determination of the parties' intent when entering into the contract, and the fees themselves were limited to prejudgment attorney fees. See *Fontana*, 362 Ill. App. 3d at 509. Here, on the other hand, the fees at issue are postjudgment fees incurred in an effort to collect the judgment against the judgment debtor and in an ancillary cause brought in order to enforce the judgment against others. Our inquiry, then, is a nuanced one: whether a judgment creditor can recover attorney fees incurred in successfully piercing a corporation's veil in order to enforce a previously obtained judgment award where that judgment award was based on the underlying contract providing for a fee award.

¶ 86　　　While not binding on this court, we find the reasoning in Seventh Circuit's decision of *Centerpoint Energy Services, Inc. v. Halim*, 743 F.3d 503 (7th Cir. 2014), persuasive. The *Centerpoint* court applied Illinois law in support of an award of contractually based attorney fees, finding a judgment creditor was entitled to attorney fees for costs incurred in bringing a subsequent action to enforce the original judgment. The *Centerpoint* plaintiff had obtained a

$1.7 million judgment against Wilmette Real Estate & Management Corporation (the Wilmette judgment). *Centerpoint,* 743 F.3d at 505. The contract at issue, like the contract in the case at bar, had a clause providing for an award of attorney fees. *Centerpoint,* 743 F.3d at 505. Like Steiner, the *Centerpoint* plaintiffs were unable to collect any part of the judgment, because Wilmette was "a shell" by the time of the judgment. *Centerpoint,* 743 F.3d at 505. Again reminiscent of the situation with Steiner, the owners of Wilmette had transferred Wilmette's "financial and other assets" to a new company wholly owned by them, WR Property Management. *Centerpoint,* 743 F.3d at 505. The *Centerpoint* plaintiffs sued Wilmette's successor to enforce the Wilmette judgment (the enforcement action), alleging in part that the Wilmette owners had fraudulently transferred Wilmette's assets and were Wilmette's alter egos, rendering them liable for the Wilmette judgment. *Centerpoint,* 743 F.3d at 505-06. The district court entered judgment in favor of the plaintiffs and against the Wilmette owners and the successor corporation for the full amount of the Wilmette judgment which included attorney fees, plus all attorney fees incurred in litigating the enforcement action. *Centerpoint,* 743 F.3d at 506.

¶ 87    The Seventh Circuit affirmed the judgment and the award of all of the plaintiff's attorney fees incurred through the enforcement action, reasoning:

> "The contract language quoted at the beginning of this opinion, which makes Wilmette (and derivatively [owner] Halims and WR) liable 'for all costs and expenses incurred by [plaintiff] (including reasonable attorney fees) to collect amounts due and owing,' is broad enough to embrace the expenses incurred by [plaintiff] in this suit-a suit to collect amounts owed [plaintiff] by virtue of Wilmette's breach." *Centerpoint,* 743 F.3d at 508.

35

¶ 88      Similarly, we find that the contract language in the Delta-Steiner credit application, that is, language providing for "all reasonable costs of collection including attorney fees and expenses," as well as "[t]he customer shall be responsible for all costs of collection incurred by Company, including without limitation lien costs and all attorneys' fees and expenses" is "broad enough to embrace the expenses incurred" by Steiner in its suit to collect amounts owed Steiner by virtue of Delta's breach. See, *e.g.*, *Centerpoint*, 743 F.3d at 508; see also *Wachovia Securities, LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 759 (7th Cir. 2012) (noting, without discussion, that "[i]n Illinois, a party who prevails on a veil-piercing claim may recover their fees if the underlying contract provides for a fee award").

¶ 89      We also find pursuasive the reasoning of our sister court, the Colorado Court of Appeals, in *Swinerton Builders v. Nassi*, 272 P.3d 1174 (Colo. App. 2012). The situation in *Swinerton* is very similar to the situation at bar. In *Swinerton*, the appeals court was tasked with determining whether to affirm or reverse the trial court's denial of attorney fees to a successful plaintiff in a piercing action to enforce a judgment based upon an attorney fee award provision in the underlying contract. *Swinerton*, 272 P.3d at 1176. The plaintiff, Swinerton Builders, had entered into a construction contract with Beauvallon Corporation, which included an agreement that disputes would be arbitrated. *Swinerton*, 272 P.3d at 1174. The *Swinerton* contract, like the contract here, also contained an explicit fee shifting provision. *Swinerton*, 272 P.3d at 1176. Eventually, Swinerton filed a breach of contract action against Beauvallon, demanding arbitration. *Swinerton*, 272 P.3d at 1174. Ultimately, the arbitrators ordered Beauvallon to pay Swinerton damages, interest, attorney fees, and costs. *Swinerton*, 272 P.3d at 1174. After the circuit court entered judgment on the award, Swinerton filed a separate piercing action to enforce the judgment against Beauvallon's

36

president. *Swinerton*, 272 P.3d at 1176. The trial court pierced Beauvallon's corporate veil and held its president liable for the judgment. *Swinerton*, 272 P.3d at 1176. Again like the case at bar, the trial court did not award attorney fees for the piercing action, determining that the underlying contract only provided for attorney fees for the original judgment and not for the subsequent veil-piercing judgment. *Swinerton*, 272 P.3d at 1176. On appeal, the court determined that the piercing claim was a procedural mechanism to enforce the underlying judgment and reversed, concluding:

> "As an apparent matter of first impression in Colorado, we conclude that a party who prevails in an action to pierce the corporate veil of a corporation may recover the attorney fees and costs incurred in that action if (1) the action was brought to enforce a breach of contract judgment against the corporation, and (2) the contract underlying the judgment authorized an award of fees and costs for enforcing the judgment against the corporation." *Swinerton*, 272 P.3d at 1175.

Like *Swinerton*, we conclude that a party who prevails in an action to pierce the corporate veil of a corporation may recover the attorney fees and costs incurred in that action when the contract underlying the judgment authorized an award of attorney fees for enforcing the judgment against the corporation.

¶ 90          We note here that, by not filing an appellee brief, Maniscalco and Sackett have not raised the applicability or impact, if any, of the merger doctrine. The merger doctrine generally provides that, upon entry of a judgment, a plaintiff's claims against a defendant are merged into the judgment. *Poilevey v. Spivack*, 368 Ill. App. 3d 412, 415 (2006). We therefore will not go into detail regarding the merger doctrine, but note it does not bar Steiner's claim for attorney fees, as Illinois courts have held the merger rule does not apply to

ancillary attorney fees. *Poilevey*, 368 Ill. App. 3d at 415 (citing *Stein v. Spainhour*, 196 Ill. App. 3d 65, 70 (1990)). Additionally, we also quote here the *Centerpoint* court's reasoning when it, too, determined the merger doctrine is unavailable to preclude the award of attorney fees that were ancillary to the underlying cause of action:

> "Illinois law does not merge a contractual right to attorneys' fees into a judgment when the fees are ancillary to the primary cause of action. *Stein v. Spainhour*, [196 Ill. App. 3d 65, 76] (1990); see also *Lowrance v. Hacker*¸ 966 F.2d 1153, 1157-58 (7th Cir. 1992) (Illinois law), and the attorneys' fees incurred by [*Centerpoint* plaintiff] to enforce the state court judgment in a separate proceeding in a different court system were ancillary to the fees incurred in the primary proceeding, which was the state court case that established the defendants' breach of the gas contract.

> Merger would encourage the kind of contumacy displayed by the Halims in this case, because by voiding the attorneys' fees provision in the gas contract it would reduce the cost to them of unlawfully resisting efforts to collect a judgment awarded against them and upheld on appeal." Internal quotation marks omitted. *Centerpoint,* 743 F.3d at 508.

¶ 91 Here, a fair reading of the contract as well as of Illinois, Federal, and sister state law leads us to determine that Maniscalco and Sackett should be held liable for the attorney fees incurred by judgment creditor Steiner, not only in obtaining a judgment against Delta, but also in seeking to collect that judgment and pursuing its veil-piercing claims in order to enforce the judgment.

¶ 92    We recognize that the circuit court made its decision based on Illinois law in the best way that it could, as no Illinois court of review, to this point, has held that a plaintiff may recover attorney fees in a separate piercing action.  We reverse the portion of the circuit court's order denying Steiner's request for attorney fees and remand the cause, directing the circuit court to determine the reasonable amount of such fees on remand.

¶ 93                                III.  CONCLUSION

¶ 94    For all of the foregoing reasons, the judgment of the circuit court of Cook County is affirmed in part and reversed in part; cause remanded with directions.

¶ 95    Affirmed in part; reversed in part; remanded with directions.